UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | : | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO. 1:23-CR-037(1)** |
| | : | |
| Plaintiff, | : | **JUDGE BARRETT** |
| v. | : | |
| | : | **UNITED STATES' SENTENCING** |
| **RODERICO Allen,** | : | **MEMORANDUM** |
| | : | |
| Defendant. | : | |
| | : | |

# INTRODUCTION

Defendant Roderico "Rico" Allen used stolen credit card information to buy several thousand dollars' worth of firearms online. Then he recruited at least three other people to pick up the firearms for him in illegal straw purchases that circumvented federal laws designed to prevent firearms from falling into the hands of criminals. And he did so while on probation for another crime, and under conditions of probation that prohibited him from possessing a firearm.

For the reasons given below, the government respectfully requests that the Court impose a Guidelines sentence, although one at the low end of the range: 70 months' imprisonment.

# BACKGROUND

**A. Allen used stolen credit card information to buy firearms online; he placed the orders in the names of others he had recruited to pick the firearms up for him.**

As of May and June 2022, defendant Roderico Allen was prohibited from possessing firearms under the terms of his state probation. Nevertheless, he made more than one hundred attempts to place online orders for firearms with Guns.com, an online firearms dealer. All of the orders were placed in the names of other people whom Allen had recruited to pick up the

firearms for him: his girlfriend Jaidah Jones and his associates Tyler Sneed and Kazyra Robertson.

Not only did Allen place the orders in others' names, but he also paid for them with stolen credit card information. For example, on May 21, 2022, Allen, without the knowledge or permission of victim J.N., knowingly used J.N.'s credit card information to make an online purchase of a Rain Ordnance Fallout 15 5.56 caliber rifle and a Cline Tactical C-19 8 Ball pistol, collectively valued at approximately $2,650.

Under federal law, the firearms could not be shipped directly to Allen or a coconspirator; they had to be shipped to a local federal firearms licensee (FFL), where the transfer could be completed after the buyer filled out an ATF Form 4473 – Firearms Transaction Record. One of the questions on the ATF Form 4473 was: "Are you the actual transferee/buyer of the firearm(s) listed on this form . . . .?" The Form clarified that the person was "not the actual transferee/buyer if [they were] acquiring the firearm(s) on behalf of another person" and that, if they were not the actual transferee/buyer, the FFL could not transfer the firearm to them.

Allen and his coconspirators agreed that the coconspirators would falsely represent to the FFLs that they were, indeed, the "actual transferee/buyer" of all of the firearms, when in fact they intended to provide at least some of the firearms to Allen.

Text messages recovered from the coconspirators' phones show how they understood that Allen was trying to obtain firearms under other people's names and that he was reselling the firearms. For example, on May 24, 2022, Sneed wrote to Robertson: "Rico [Allen] said you want a gun." Robertson responded, "I'm not buying no gun from him," and Sneed clarified: "No u get them online they new u pick them up out the gun store." When Robertson said, "uhn uhn they mean he gone get a gun for him in my name," Sneed responded, "man so what <u>I just let him do it</u>

2

<u>in my name I told him if he sell them lmk so I can report it stolen</u>" (emphasis added). Robertson responded, "oh okay well what you think I should get?"

The text messages also show how Allen, at times through Sneed, directed Jones and Robertson where to go and which firearms to pick up. For example, on June 2, 2022, Sneed texted Robertson about three firearms Allen had ordered: "He [Allen] said them guns up there u can go grab them just takes pics of the numbers so when u drop them off." Robertson asked how many there were, and Sneed said three. Robertson asked, "Which guns am I getting babe," and Sneed responded, "It's a fn a glock and Draco." When Robertson later ran into difficulties picking up the firearms, Sneed instructed her to "call rico [Allen]."

The next day, June 3, 2022, Allen texted Robertson: "Ay this Rico . . . They said it came. Can you bring them I'll give you gas." Robertson asked, "all three[?]", and Allen responded, "yeah they just called said all 3." Robertson responded, "Okay." Allen later warned Robertson that the (stolen) credit card he used might be declined: "Card could come back they a send them back that's it ion want them to." Robertson later texted Allen that she was at the store, and he told her to "lmk when you can bring that Glock," clarifying that she should bring it to his home on Ravenna.

Although Guns.com's fraud-prevention systems prevented many of the orders from being fulfilled, and although the Cincinnati FFLs identified some of the transactions as illegal "straw purchases" and stopped them, nine firearms were shipped from out of state to FFLs in Cincinnati, and Allen and his coconspirators succeeded in obtaining at least approximately six of these.

    **B. Allen repeatedly fled from law enforcement after learning he was wanted.**

When Allen realized his crimes were catching up with him, he made a run for it. Specifically, when law enforcement went to Allen's apartment in April 2023 and tried to arrest

3

Allen and Jaidah Jones, they initially went to the wrong door. As they knocked and announced themselves as law enforcement officers, Allen opened the door of the apartment across the hallway and exited with two dogs on leashes, saying the dogs had to go to the bathroom. The officers (who were not the investigating agents) did not recognize Allen, so they told him to take the dogs out.

Outside, Allen ran up to a vehicle, pounded on the windows, and asked the occupants for a ride. Unbeknownst to him, that vehicle was an unmarked police car, and the people inside were law enforcement officers. But, because these law enforcement officers did not recognize him either, they simply waved him away.

Eventually, the officers inside the apartment building knocked on the door Allen had come out of, and Jaidah Jones answered. At this point, officers realized Allen was the male who had left with the dogs. The officers later found one of the dogs tied up outside—but Allen was long gone.

About a month later, in May 2023, an officer attempted a traffic stop on a vehicle, and two occupants jumped out of the car and fled. During a search of the vehicle, officers found multiple documents in Allen's name, along with multiple telephones, a computer, a printer, and documents that appeared to be related to fraudulent check printing. Further linking Allen to the car is the fact that officers later learned the car had been rented in the name of B.A., whose address was the same as Allen's coconspirator Kazyra Robertson.

Eventually, the government unsealed the indictment and publicized that Allen was wanted in this case. Shortly thereafter, Allen's face appeared on at least one local newscast. When Allen's friend texted him a screenshot of the newscast, Allen wrote back that he knew about the case—and yet did not self-surrender.

Law enforcement then obtained a warrant for prospective location data for a phone Allen was using and managed to arrest him.

**C. Allen has had repeated run-ins with the law, including a prior firearms conviction.**

In 2016, Allen was convicted of Attempted Carrying Concealed Weapons and sentenced to two years' probation. Later that same year, Allen was also convicted of possession of less than 100 grams of marijuana.

A few months later, Allen was also convicted of Disorderly Conduct after he entered the home of another individual and removed bicycles, televisions, laptops, and tablets; he received a 30-day jail sentence, with 27 days suspended, and one year of probation. While on supervision, he was charged with a probation violation for incurring new charges and failing to complete his community service.

In 2017, just three months after his prior conviction for Disorderly Conduct, Allen was convicted of Theft and sentenced to 180 days in jail, with 177 days suspended, and two years of non-reporting probation.

Two months after that, Allen was again convicted of possessing less than 100 grams of marijuana.

The next year, 2018, Allen was convicted of Aggravated possession of Drugs (ecstasy) and was sentenced to two years' probation.

Most recently, in 2021, Allen was convicted of Unlawful Restraint—and an additional charge of Domestic Violence was dismissed—after he restrained C.S., a member of his household, against her will. He was sentenced to 60 days in jail, with 58 days suspended, and a year of probation—and he was still on probation for that offense when he orchestrated the identity-theft and gun-trafficking scheme at issue here.

## APPLICABLE LAW

The Sentencing Guidelines "should be the starting point and the initial benchmark for choosing a defendant's sentence." *United States v. Demma*, 948 F.3d 722, 727 (6th Cir. 2020) (internal quotations omitted). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). Then, "the district court must weigh and apply the range of factors outlined in 18 U.S.C. § 3553(a)." *Id.* at 49-50. These include (1) the nature and circumstances of the offense and the history and characteristics of the defendant and (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a). The Court should impose a sentence sufficient but not greater than necessary to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *See* 18 U.S.C. § 3553(a).

## ARGUMENT

**A. The government agrees with the Guidelines calculation and statutory requirements set out in the Presentence Report.**

The government agrees with the Guidelines calculations in the Final Presentence Report, which result in a Guidelines range of 46-57 months on Count 2, with a consecutive 24 months on Count 9, for an effective range of 70 to 81 months' imprisonment.

The statutory maximum term of imprisonment on Count 2 is ten years. The mandatory term of imprisonment on Count 9 is two years, and the sentence on this count must be imposed consecutively to any other counts. (PSR ¶¶ 106-07.)

6

The maximum term of supervised release on Count 2 is three years, and the maximum term on Count 9 is one year. Multiple terms of supervised release run concurrently. (PSR ¶¶ 114-15.)

The maximum fine is $250,000 on each count. Additionally, there is a $100 mandatory special assessment on each count. (PSR ¶¶ 119-20.)

Finally, restitution is mandatory under 18 U.S.C. § 3663(a)(3). As set forth in the PSR, restitution to Guns.com is due in the amount of $6,938.75. Of those funds, $3,498.56 should be paid joint and several with Tyler Sneed; $1,021.11 should be paid joint and several with both Tyler Sneed and Kazyra Robertson; and $2,419.08 should be paid joint and several with Jaidah Jones.

**B. The government respectfully submits that a consideration of the § 3553(a) factors shows that a sentence of 70 months is appropriate here.**

The nature and circumstances of the offense weigh in favor of a substantial prison sentence. As an initial matter, Allen used stolen credit card information to enrich himself. But he did not used those credit cards to buy new shoes or have pizza delivered; of all things, he chose to order firearms—weapons that all too often end up being used in violent crimes around the Cincinnati area. Even worse, Allen recruited his three codefendants—Sneed, Robertson, and Jones—to pick up the firearms for him in illegal straw purchases, circumventing the federal law that helps prevent criminals from obtaining deadly weapons. And Allen did all of this while on probation, under conditions that prohibited him from possessing a firearm.

Moreover, although in his sentencing memorandum Allen claims that Zephaniah Jones placed the orders, the orders at issue in this case all came back to email addresses, phone numbers, and/or IP addresses linked to Allen—not to the email addresses, phone numbers, and IP addresses linked Jones, which were at issue in the sister case. (Case No. 1:23-CR-036.)

7

Additionally, based on the incident described above, in which it appears that Allen fled from a vehicle after a traffic stop and evidence of identity theft was found inside, there is evidence that Allen was engaged in identity theft even beyond what was involved in this firearms scheme.

The government has no reason to doubt that Allen did, in fact, learn the method from Jones, and perhaps that Jones and Allen even placed some of the orders together—but there is no evidence that the firearms ultimately went to Jones (who had his own straw purchasers) rather than Allen. Indeed, the text messages between Sneed and Robertson show that the two had discussed that if Allen sold the guns, he would simply let Sneed know so that Sneed could falsely report them stolen.

Allen's history and characteristics present a mix of mitigating and aggravating circumstances. Although his father was incarcerated for murder for most of his childhood, Allen reported that his stepfather came into his life starting at age four, that his mother worked as a state-tested nursing aide, and that his stepfather was also employed. He reports that his family was never financially stable, but that he never went without necessities either. He reported no abuse and said his family attended his basketball games growing up. His family traveled from time to time, including to Florida, Tennessee, and Alabama. Overall, therefore, the PSR does not describe the type of childhood that would be expected inevitably to lead a person to a life of crime.

The PSR does detail one particularly disturbing incident from Allen's childhood, however: When he was eleven years old and playing at a friend's house, one of his friends accidentally shot and killed himself. But it is hard to know how this incident cuts. One might reasonably have expected a person who experienced firsthand how quickly guns can destroy lives, and even kill children, to stay far away from guns in the future. Instead, Allen chose to engage in the crime at issue here—helping put guns in the hands of people who either did not

want to, or could not, purchase the guns in their own names—and recruited three other people to help him do so. Put another way, the fact that Allen lived through the horrifying incident involving the accidental shooting death of his friend and then went on to be convicted of carrying concealed weapons, and now this firearms offense, suggests that he has not learned to stay away from guns and presents a serious risk of recidivism.

Another factor that suggests Allen presents a serious risk of recidivism is his nearly nonexistent employment record. Although one of the conditions of Allen's pretrial release was that he find and maintain employment, he reported that his last job was at Gorilla Glue in 2019—more than five years ago. He did not report being disabled, nor does the PSR give any indication that he has any other impediment to finding employment, other than an apparent unwillingness to doing so. The fact that Allen has failed for years to maintain employment, even when under a court order to do so, and even with the assistance of a Pretrial Services officer, suggests that he presents a significant risk of reoffending up on his release from prison.

The government also respectfully submits that the need to avoid unwarranted disparities weighs in favor of a substantial prison term here. Zephaniah Jones, the leader of a very similar identity-theft and gun-trafficking conspiracy, was recently sentenced to 79 months' imprisonment. Jones had just one misdemeanor conviction in his criminal history, whereas Allen has a string of prior convictions, including a prior firearms-related offense. Jones was not prohibited from possessing a firearm during the offense, whereas Allen was so prohibited under the terms of his probation. Jones managed to obtain and resell far more firearms than Allen, but this difference is already reflected in the Guidelines range, given that Jones received an additional two points for trafficking more than 24 firearms. Similarly, Jones had more coconspirators acting as runners, but this, too, is reflected in his four-point enhancement for being an organizer or leader, as compared to Allen's two-point enhancement for organizing a

smaller group.

Ultimately, the government respectfully submits that a sentence within the Guidelines range is appropriate in this case. What mitigating circumstances are present here are relatively minor, and they are arguably counterbalanced the aggravating circumstances, including the likelihood of recidivism shown by Allen's criminal history and failure to maintain employment. The Guidelines range is 70 to 81 months' imprisonment; the government respectfully requests that the Court impose a sentence at the low end of this range: 70 months. To help address the risk of recidivism upon Allen's release from prison, the government also requests that the Court impose three years' supervised release on Count 2 and one year of supervised release on Count 9, to run concurrently. Finally, the government requests that the Court order the payment of $200 in special assessments, and that restitution of $6,938.75 be paid as set out in the PSR.

## CONCLUSION

For the reasons given above, the government respectfully requests that the Court sentence Roderico Allen to 70 months' imprisonment, three years of supervised release, $6,938.75 in restitution to Guns.com, and $200 in special assessments.

Respectfully submitted,

KENNETH L. PARKER
UNITED STATES ATTORNEY

*/s/Julie D. Garcia*
JULIE D. GARCIA (CA 288624)
Assistant United States Attorneys
United States Attorney's Office
221 E. Fourth St. Suite 400
Cincinnati, OH 45202
513-684-3711
Ashley.Brucato@usdoj.gov
Julie.Garcia@usdoj.gov